UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

KRISTEN MAGGI, ARIELLE WILBUR, LAURA YEATES, and MIRANDA ACKERMAN, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

KIND PATCHES LIMITED,

Defendant.

Case No.: 1:26-cv-1466 (MAD/DJS)

**CLASS ACTION COMPLAINT**

**(DEMAND FOR JURY TRIAL)**

Plaintiffs Kristen Maggi, Arielle Wilbur, Laura Yeates, and Miranda Ackerman ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant Kind Patches Limited ("Kind" or "Defendant") and allege as follows:

## INTRODUCTION

1. Kind develops, distributes, markets, and sells an assortment of transdermal wellness patches, which contain natural ingredients and are advertised as a simple and holistic alternative to prescription medications. Plaintiffs' instant putative class action complaint concerns Kind's marketing and sale of just one type of its patches, the "Dopamine Patches," which are now called "Mood+ Patches (Formerly Dopamine)," although often still referred to as "Dopamine Patches" on customers' purchase receipts (collectively referred to as "Dopamine Patches"). Kind falsely and deceptively misrepresents to consumers that its Dopamine Patches contain "dopamine" and provide positive neurological benefits, when in fact, they do not contain any dopamine and thus, do not work as advertised.

2. Dopamine is a chemical messenger naturally produced in the body that is responsible for facilitating an array physical and psychological functions including regulating

mood, driving motivation, experiencing pleasure, and ushering in focus and attention. Low dopamine levels are associated with negative symptoms like mood swings, lack of concentration and initiative, feelings of anxiety, unhappiness, and despair, and are even linked to some of the most globally widespread neurological conditions including, attention-deficit/hyperactivity disorder (ADHD), Parkinson's disease, and restless leg syndrome (RLS).

3. As a result, FDA-approved prescription medications are commonly prescribed to treat many of these diseases. For example, medical-grade transdermal dopamine patches such as, rotigotine, which is a dopamine agonist—a chemical compound that mimics dopamine by stimulating dopamine receptors in the brain—and is approved to treat RLS and Parkinson's disease. Similarly, stimulants like methylphenidate and amphetamine/dextroamphetamine are used to reduce the symptoms of ADHD by increasing deficient neurotransmitter levels, such as dopamine and norepinephrine.

4. In lieu of these approved medications, Kind touts its Dopamine Patches as a natural supplement designed to target and improve mood, attention, focus, and motivation by way of increased dopamine production. On the front label of the product packaging, Kind describes its "Dopamine Patches" as "Mental Wellness" patches and claims that these patches will "Support[] Dopamine and Serotonin Production" and "Mood Support and Positivity." On its website, in publicly available marketing materials, and on social media , Kind promises consumers that the Dopamine Patches will "support[] mood stability and emotional balance" to "feel more like yourself"; will "elevate feelings of mental wellness"; provide "a natural way to stay balanced and motivated throughout your day"; and "are designed to support your mental well-being with ease."

5. However, Kind's advertising and marketing campaign is false, deceptive, and misleading because the Dopamine Patches do not contain any of the actual dopamine chemical

whatsoever, and thus, do not provide consumers with any of the advertised mood benefits. In other words, Kind advertises and sells its Dopamine Patches as containing "dopamine," when in fact, it is simply false. Instead, Kind's Dopamine Patches contain a variety of herbal extracts such as, lion's mane mushroom and rhodiola, which are ineffective at providing the same benefits as the actual dopamine chemical or a dopamine agonist via transdermal delivery.

6. Kind's strategy to create a line of Dopamine Patches for sale in the supplement market is not accidental. Since early 2025, Kind, capitalizing on the public's heightened intrigue for biohacks, has developed, distributed, marketed, and sold the Dopamine Patches in the online marketplace and at various retail stores, targeting health-conscious consumers who desire attaining the positive neurological benefits associated with the "feel good" hormone dopamine.

7. Growing consumer fascination and desire for holistic alternatives to synthetic drugs has spurred in light of several factors like limited access to healthcare, increased costs for filling prescription medications, and greater transparency of ongoing developments in scientific literature and clinical trials illustrating the dangerous side effects of long-term prescription drug use. Consumers purchase Kind's Dopamine Patches in hopes that they will receive the positive attributes commonly associated with dopamine without any of the aforementioned obstacles, costs, or drawbacks. In reality, however, because the Dopamine Patches do not contain "dopamine" as advertised, consumers do not receive any of the promised health benefits.

8. Plaintiffs and those similarly situated class members relied to their detriment on Kind's misrepresentations that their Dopamine Patches did in fact contain dopamine when deciding to purchase the patches. Plaintiffs and Class Members would not have purchased the Dopamine Patches absent Defendant's misrepresentations regarding the composition and efficacy

of the Dopamine Patches. As a result, Plaintiffs and Class Member suffered monetary damages as a result of Defendant's false and misleading advertising.

## **JURISDICTION AND VENUE**

9. This Court has original jurisdiction over this putative class action lawsuit pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d)(2) & (6), because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs; there are more than 100 members of the proposed classes; and at least one member of each proposed classes is a citizen of a different state than Kind.

10. This Court has personal jurisdiction over Kind because it purposefully directed its activities in this District, committed the wrongful acts alleged herein in New York, regularly conducts business in this District, and has extensive contacts with this forum.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District, and Kind regularly conducts business in this District.

## **PARTIES**

12. Plaintiff Kristen Maggi is a citizen and resident of Sharon Springs, New York.

13. Plaintiff Arielle Wilbur is a citizen and resident of Hemet, California.

14. Plaintiff Laura Yeates is a citizen and resident of Sanborn, New York.

15. Plaintiff Miranda Ackerman is a citizen and resident of Woodland, California.

16. Defendant Kind Patches Limited is a company registered in England and Wales with its registered office address in Berkhamsted, United Kingdom.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

- **Background of Dopamine's Role in Neurological Mood Disorders**

17. Dopamine is a neurotransmitter, or chemical messenger that carries signals between nerves, created in the brain and gut that is primarily responsible for feelings of pleasure and satisfaction, but is also involved in a host of bodily functions like mood, movement, motivation, sleep, memory, concentration, lactation, and arousal, amongst many others.[1]

18. A dopamine "rush" or "release" is triggered when one engages in pleasurable activities and serves as the brain's way to teach us the interplay between pleasure and reward.[2] But a deficiency occurs when too little dopamine is released and is linked to negative symptoms of low mood, a lack of motivation and concentration, and depression.[3]

19. Since dopamine plays a critical role in key behavioral aspects, research suggests that malfunctions with the brain's dopamine signaling processes, and thus, low dopamine levels, may be linked to the development of ADHD and/or at least represents a contributing factor to ADHD symptoms.[4]

20. For this reason, pharmaceutical companies sell FDA-approved prescription medications to treat specific conditions associated with dopamine deficiency, such as Ritalin (methylphenidate), a stimulant used to treat ADHD by increasing dopamine levels in the brain,[5]

---

[1] Dopamine, The Cleveland Clinic, last updated March 23, 2022, available at https://my.clevelandclinic.org/health/articles/22581-dopamine.
[2] Dopamine: The pathway to pleasure, Harvard Health Publishing, Harvard Medical School, available at https://www.health.harvard.edu/mind-and-mood/dopamine-the-pathway-to-pleasure.
[3] *Id.*
[4] What is the Role of Dopamine in ADHD?, Healthline, last medically reviewed on October 10, 2024, available at https://www.healthline.com/health/adhd/adhd-dopamine#takeaway.
[5] Scott Gottlieb, Methylphenidate works by increasing dopamine levels, PubMed Central, National Library of Medicine, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC1119521/.

and Neupro (rotigotine), a transdermal patch used to treat Parkinson's disease and RLS by delivering a dopamine agonist through the skin and into the bloodstream.[6]

21. However, Americans today face many obstacles to attaining access to affordable health care and prescription medications. Polling reports illustrate that approximately 59% of U.S. adults are worried about being able to afford prescription medications, while approximately 43% of adults have failed to take their medication as prescribed due to costs, and have resorted to other cost-saving measures such as skipping doses and purchasing over-the-counter drugs instead.[7]

22. It is no surprise, then, in a world where diagnosed and undiagnosed neurological conditions like ADHD are prevalent amongst adults and children alike,[8] the appeal for affordable and accessible dopamine-inducing products in the consumer marketplace soars.

- **Kind's Advertising and Marketing of the Dopamine Patches**

23. Kind touts itself as a "natural beauty and health patch company that is here to revolutionize the way you take care of yourself." Defendant sells a variety of transdermal wellness patches that are "developed with function-focused formulas tailored to support different wellness, beauty, and lifestyle needs." Alongside Kind's Dopamine Patches, Defendant's other top sellers include the Berberine Patches, Unpuff Patches, and Metabolism Booster Patches.

24. Kind's transdermal patches are adhesive stickers that supposedly work by delivering ingredients through the wearer's skin. Defendant boasts its transdermal patches as "a

---

[6] The Neupro Patch, Neupro (rotigotine transdermal system), available at https://www.neupro.com/parkinsons-disease/rotigotine-dopamine-agonist.

[7] Audrey Kearney, *et al.*, Public Opinion on Prescription Drugs and Their Prices, KFF, published March 31, 2026, available at https://www.kff.org/health-costs/public-opinion-on-prescription-drugs-and-their-prices/.

[8] Attention-Deficit/Hyperactivity Disorder (ADHD), National Institute of Mental Health, available at https://www.nimh.nih.gov/health/statistics/attention-deficit-hyperactivity-disorder-adhd.

simple, wearable way to support your daily wellness routine" without the hassle of "pills," "powders," or "complicated routines."

25. In early 2025, Kind began selling its Dopamine Patches on its official website, KindPatches.com, and in major retail stores and online platforms such as Walmart, Target, Amazon, Ulta Beauty, and CVS Pharmacy, to name a few.

26. On the front and center of Kind's Dopamine Patches' product packaging, in the largest text most noticeable to consumers is the label "**Dopamine Patches**" in bolded black lettering contrasting against the bright yellow background.




27. Immediately underneath the prominent "Dopamine" label in smaller black font against a white background is the product description: "30 Mental Wellness Patches," and below

that, in a smaller font, is the representation that Defendant's Dopamine Patch "Supports Dopamine and Serotonin Production" and "Mood Support and Positivity."

28. Defendant's website prominently displayed a large banner advertisement located at the top of the webpage with the Dopamine Patches product behind a ball-and-stick model—purporting to represent the chemical compound of dopamine—bonded together by smiley faces. To the left of the image, Kind advertised that the Dopamine Patches "Support Your Mood. Feel More You."




29. Defendant's website claims that Kind's Dopamine Patches "are designed to help maintain emotional balance and promote a sense of well-being" and are "an easy, convenient way to help promote a positive mood and encourage mental clarity throughout your day."

30. Defendant's website also claims that the Dopamine Patches "provide[] steady, sustained support" by "gradually releasing key ingredients…without the sudden ups and downs often linked to quick dopamine spikes."

31. On its Instagram page, Kind represents that its Dopamine Patches "gently support[] your body's natural dopamine production—helping you feel more balanced, clear-headed, and energized throughout the day."




32. Defendant's label representations and online advertisements collectively induce consumers like Plaintiffs to believe that the Dopamine Patches contain dopamine as the key ingredient and will work as effectively as dopamine-containing and/or dopamine agonist medications to provide the advertised neurological health benefits.

33. Unfortunately, however, Defendant's representations that its patches contain "dopamine" and will work as advertised is nothing but a sham because the herbal ingredients in the patches are not as effective at providing the same benefits as the actual dopamine chemical or a dopamine agonist via transdermal delivery.

34. Indeed, hidden on the back of the product packaging in miniscule font size, Defendant's ingredient list reveals that its Dopamine Patches do not in fact contain any dopamine. Instead, the patches contain macuna pruiens extract, 5-HTP, lion's mane mushroom extract, and rhodiola extract.




35. Throughout the liability period as defined below, Defendant has engaged in an advertising and marketing campaign that falsely represents that its Dopamine Patches actually contain "dopamine" and thus, provides the positive mental and mood benefits widely recognized and associated with the dopamine chemical or dopamine agonist prescription medications.

36. As a result of this deception, Defendant sold numerous units of the Dopamine Patches through its website and through many other retail stores and online channels.

37. Plaintiffs and members of the Classes have been, and will continue to be, deceived or misled by Defendant's deceptive advertising claims. Each Class Member purchased and used the Dopamine Patches during the liability period and in doing so, read and considered the advertising claims on the Dopamine Patches packaging and marketing materials and based their decision to purchase the Dopamine Patches on the advertising claims. Defendant's advertising claim that the Dopamine Patches contained dopamine was not only a material factor, but the only factor in influencing Plaintiffs' decisions to purchase and use the Dopamine Patches.

38. Plaintiffs and the Class Members would not have purchased the Dopamine Patches had they known that they did not contain any dopamine, and thus, would not provide any of the cognitive benefits associated with dopamine.

- **Kind's Advertising Claims for the Dopamine Patches are False and Deceptive**

39. Despite this prominent marketing and advertising, Kind's Dopamine Patches do not contain any dopamine and do not "support" dopamine production as promised because its herbal ingredients are ineffective at providing the same benefits as the actual dopamine chemical or a dopamine agonist via transdermal delivery.

40. Ellen Walker, PhD, chair of the department of pharmaceutical sciences at Temple University School of Pharmacy, told SELF magazine "[t]hat they call them dopamine patches is complete false advertising, which is, I think, a very unfair thing to consumers."[9]

41. In the same article, board-certified critical care pharmacist and clinical pharmacist consultant, Niousha Nader, PharmD, explained that although the dopamine patches are named after the chemical messenger dopamine that helps humans feel pleasure and encourage motivation, the patches themselves do not actually contain dopamine, but rather, vitamins and other nutrients.[10]

42. When asked about the efficacy of the herbal ingredients included in natural transdermal patches like Kind's Dopamine Patches, psychiatrist Nissa Keyashian, MD, stated in an article that "[a]lthough limited data suggest some of the ingredients in these products may slightly help mood and cognitive symptoms, there is no strong evidence that they are effective and safe medications for ADHD."[11]

---

[9] Women Explain Why They're Self-Medicating with Dopamine patches for ADHD, SELF, March 13, 2026, available at https://www.self.com/story/dopamine-patches-for-adhd.

[10] *Id.*

[11] Can Dopamine Patches Improve Focus, Mood, and Energy?, Everyday Health, April 20, 2026, available at https://www.everydayhealth.com/healthy-living/can-dopamine-patches-improve-focus-mood-energy/.

43. An article in GlobeNewswire explained the scientific limitations to the transdermal delivery of herbal ingredients versus pharmaceutical formulations in general:

> Scientific research shows that the skin acts as a strong barrier designed to prevent the entry of most external substances. Effective transdermal delivery of therapeutic compounds typically requires advanced pharmaceutical formulation techniques. These may include penetration enhancers, microneedle systems, or specialized encapsulation technologies developed through extensive research.
>
> Prescription transdermal patches, such as nicotine or hormone replacement patches, undergo years of development to achieve consistent and measurable delivery. **Herbal wellness patches containing botanical ingredients face different scientific challenges, and published research does not currently demonstrate reliable transdermal delivery of many plant compounds at therapeutic levels.**[12]

44. In fact, the Advertising Standards Authority (ASA), the United Kingdom's independent regulator of media advertising, issued a ruling on February 4, 2026, where it determined the following paid Facebook advertisement about Kind's health claims for the Dopamine Patches was "misleading" and accordingly, prohibited Kind from publishing the ad and from "stat[ing] or imply[ing] that their products had health benefits without holding adequate substantiation":[13]

> Ad (c) stated, "Struggling to stay focused or feeling mentally drained? The Dopamine patch is now available…to support your emotional wellbeing". It further stated, "Supports a balanced mood", "Helps maintain daily mental clarity", "Designed to reduce everyday stress" and made references to being "Motivated" and supporting "drive". We considered that consumers were likely to understand the claims to mean the product could help with focus, mood, stress, motivation and overall mental and emotional wellbeing. In addition, because it stated, "Low dopamine steals your spark. Dopamine Patches help bring it back", that the product's described benefits would be achieved by increasing dopamine in the body.

---

[12] Rejuvacare Ozempatch Ingredients Examined: 2026 Verified Consumer Reports of Herbal Weight Loss Patch Formulaiton Claims, Global Newswire, January 10, 2026, available at https://finance.yahoo.com/news/rejuvacare-ozempatch-ingredients-examined-2026-122800981.html (emphasis added).

[13] ASA Ruling on Kind Patches LTD, ASA, available at https://www.asa.org.uk/rulings/kind-patches-ltd-a25-1310978-kind-patches-ltd.html.

45. The ASA reviewed the evidence submitted by Kind in support of the Dopamine Patches and amongst their finding, noted that "[s]ix of the seven clinical trials involved individual ingredients found in the Dopamine patch being administered orally, not through the skin, and in quantities that exceeded the amount found in Kind Patches' product. One clinical trial had no results and was not considered. . . Considering the evidence in its entirety, we concluded that the claims has not been substantiated and the ads were misleading."[14]

46. As illustrated above, whether Kind's Dopamine Patches contain "dopamine" and whether it can provide the advertised health benefits can be determined with objective factual evidence.

47. The advertising and marketing of the Dopamine Patches as containing "dopamine" is in a prominent place, front and center on the label of the products, demonstrates Defendant's awareness that this claim about the product's composition is material to consumers.

48. Defendant's deceptive representations are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchasing decisions.

49. Plaintiffs and Class Members reasonably relied to their detriment on Defendant's misleading and deceptive representations.

50. In making the false, misleading, and deceptive representations described herein, Defendant knew and intended that consumers would purchase a product advertised as containing "dopamine" over comparable products that are not advertised as containing "dopamine."

51. In fact, Defendant has admitted on its website, buried in fine print where consumers are not likely to see, that its Dopamine Patches do not contain dopamine.

[14] *Id.*

52. As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations, Defendant injured Plaintiffs and the Class Members in that the Classes:

a. Paid a sum of money for a product that was not what Defendant represented;

b. Were deprived of the benefit of the bargain because the Dopamine Patches they purchased was different from what Defendant warranted; and

c. Were deprived of the benefit of the bargain because the Dopamine Patches they purchased had less value than what Defendant represented.

53. Had Defendant not made the false, misleading, and deceptive representations, Plaintiffs and the Class Members would not have purchased the Dopamine Patches at all, or would have paid substantially less for them.

54. Consequently, Plaintiffs and the Class Members have suffered an injury in fact and lost money or property as a result of Defendant's wrongful conduct.

- **<u>Plaintiffs' Experiences</u>**

**A. Kristen Maggi**

55. On approximately December 23, 2025, Plaintiff Kristen Maggi purchased one pack of Kind Dopamine Patches on Defendant's website for $18.00, inclusive of tax and shipping.

56. Plaintiff Maggi read the front label of the Dopamine Patches' product packaging, specifically, Defendant's representation that the Dopamine Patches contained "dopamine" and that the patches "Support[ed] Dopamine and Serotonin Production" and "Mood Support and Positivity."

57. Plaintiff Maggi purchased the Dopamine Patches reasonably believing that she was receiving a transdermal patch that actually contained dopamine and its associated health benefits.

58. In making her purchasing decision, Plaintiff Maggi reasonably relied on Defendant's false and misleading misrepresentation that the Dopamine Patches did in fact contain dopamine.

59. Had Plaintiff Maggi known that Kind's Dopamine Patches did not actually contain any dopamine, were ineffective, and would not work as advertised, she would not have purchased the Dopamine Patches or would have paid less for them.

**B. Arielle Wilbur**

60. On approximately September 5, 2025, Plaintiff Arielle Wilbur purchased a pack of Kind Dopamine Patches on Defendant's website for $15.00, exclusive of tax and shipping.

61. Plaintiff Wilbur read the front label of the Dopamine Patches' product packaging, specifically, Defendant's representation that the Dopamine Patches contained "dopamine" and that the patches "Support[ed] Dopamine and Serotonin Production" and "Mood Support and Positivity."

62. Plaintiff Wilbur purchased the Dopamine Patches reasonably believing that she was receiving a transdermal patch that actually contained dopamine and its associated health benefits.

63. In making her purchasing decision, Plaintiff Wilbur reasonably relied on Defendant's false and misleading misrepresentation that the Dopamine Patches did in fact contain dopamine.

64. Had Plaintiff Wilbur known that Kind's Dopamine Patches did not actually contain any dopamine, were ineffective, and would not work as advertised, she would not have purchased the Dopamine Patches or would have paid less for them.

**C. Laura Yeates**

65. On approximately July 17, 2025, Plaintiff Laura Yeates purchased on pack of Kind Dopamine Patches on Defendant's website for $12.75, inclusive of tax and shipping.

66. Plaintiff Yeates read the front label of the Dopamine Patches' product packaging, specifically, Defendant's representation that the Dopamine Patches contained "dopamine" and that the patches "Support[ed] Dopamine and Serotonin Production" and "Mood Support and Positivity."

67. Plaintiff Yeates purchased the Dopamine Patches reasonably believing that she was receiving a transdermal patch that actually contained dopamine and its associated health benefits.

68. In making her purchasing decision, Plaintiff Yeates reasonably relied on Defendant's false and misleading misrepresentation that the Dopamine Patches did in fact contain dopamine.

69. Had Plaintiff Yeates known that Kind's Dopamine Patches did not actually contain any dopamine, were ineffective, and would not work as advertised, she would not have purchased the Dopamine Patches or would have paid less for them.

**D. Miranda Ackerman**

70. On approximately November 4, 2025, Plaintiff Miranda Ackerman purchased a pack of Kind Dopamine Patches on TikTok's Shop for $31.99.

71. Plaintiff Ackerman read the front label of the Dopamine Patches' product packaging, specifically, Defendant's representation that the Dopamine Patches contained "dopamine" and that the patches "Support[ed] Dopamine and Serotonin Production" and "Mood Support and Positivity."

72. Plaintiff Ackerman purchased the Dopamine Patches reasonably believing that she was receiving a transdermal patch that actually contained dopamine and its associated health benefits.

73. In making her purchasing decision, Plaintiff Ackerman reasonably relied on Defendant's false and misleading misrepresentation that the Dopamine Patches did in fact contain dopamine.

74. Had Plaintiff Ackerman known that Kind's Dopamine Patches did not actually contain any dopamine, were ineffective, and would not work as advertised, she would not have purchased the Dopamine Patches or would have paid less for them.

- **Online Consumer Complaints About Kind's Dopamine Patches**

75. Kind is well aware of widespread consumer dissatisfaction arising from Kind's false and misleading advertising of the Dopamine Patches.

76. Plaintiffs' experiences are far from being outliers. Below is just a small sampling of the online consumer complaints concerning Kind's Dopamine Patches:

- "I think it's kind of misleading as they're not patches containing dopamine. If only it was that easy right?" (Reddit)
- "If they aren't patches containing dopamine it's not 'kind of' misleading, it's false advertising designed specifically to be 100% misleading." (Reddit)
- "Honestly, the advertisements made the dopamine/mood patches seem like they would make me feel wonderful and happy with plenty of energy and motivation but I personally feel absolutely nothing. . . they are worthless in my opinion. . ." (Trustpilot)
- "Do not believe the reviews or commercials on this product. It does not work at all. . . So if you have ADHD and looking for dopamine enhancer this is not the route…" (Amazon)
- "I have been using the yellow dopamine patches for mood and energy and I have not felt any different I feel the same as I always do which is very disappointing because I have depression and my motivation has been so low lately I had very high

hopes for these patches to then just feel the same and no change at all was very very disappointing and I really felt misled." (Trustpilot)

## CLASS ALLEGATIONS

77. Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this action on behalf of themselves and Classes of similarly situated persons defined as follows:

**Nationwide Class:**
All persons in the United States who, during the applicable statute of limitatins, purchased Kind Dopamine Patches.

**New York Class:**
All persons in New York who, during the applicable statute of limitations, purchased Kind Dopamine Patches.

**California Class**:
All persons in California who, during the applicable statute of limitations, purchased Kind Dopamine Patches.

78. Excluded from the Classes are Defendant, any entities in which they have a controlling interest, any of their parents, subsidiaries, affiliates, officers, directors, employees and members of such persons' immediate families, and the presiding judge(s) in this case and their staff. Plaintiffs reserve the right to expand, limit, modify, or amend this class definition, including, without limitation, the addition of one or more subclasses, in connection with their motion for class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

79. **Numerosity**: The proposed Classes are numerous such that joinder is impracticable. Upon information and belief, and subject to class discovery, the identities of Class Members are within the exclusive knowledge of and can be ascertained only by resort to Defendant's records. The proposed Classes are also sufficiently ascertainable because Defendant has the administrative capability, through its computer systems and other business records, to

identify all members of the proposed Classes, and such contact information is not otherwise available to Plaintiffs.

80. **Commonality**: The questions here are ones of common or general interests such that there is a well-defined community of interest among the proposed Class Members. Such common legal or factual questions include, but are not limited to:

a. Whether Kind's misconduct misled or had the tendency to mislead consumers;

b. Whether Kind engaged in unfair, fraudulent, and unlawful business practices;

c. Whether Kind engaged in deceptive acts or practices and false advertising under the laws asserted;

d. Whether Kind's conduct constitutes violations of the laws asserted;

e. Whether Plaintiffs and the Classes were harmed by Kind's misrepresentations;

f. Whether Kind was unjustly enriched;

g. Whether Plaintiffs and the Classes have been damaged, and if so, the proper measure of damages;

h. Whether Plaintiffs and the Classes are entitled to civil penalties;

i. Whether Plaintiffs and the Classes are entitled to injunctive, declaratory relief, or other equitable relief; and

j. Whether Plaintiffs and the Classes are entitled to reasonable attorneys' fees and costs.

81. **Typicality**: Plaintiffs' claims are typical of the claims of other Class Members in that they arise out of the same wrongful business practice by Defendant, as described herein.

82. **Adequacy of Representation**: Plaintiffs are more than adequate representatives of the proposed Classes in that they have suffered damages because of Defendant's improper business practices. Additionally:

a. Plaintiffs are committed to the vigorous prosecution of this action on behalf of themselves and all others similarly situated and have retained competent counsel experienced in the prosecution of consumer class actions;

b. There is no conflict of interest between Plaintiffs and the unnamed Class Members;

c. Plaintiffs anticipate no difficulty in the management of this litigation as a class action; and

d. Plaintiffs' legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

83. **Predominance & Superiority**: Common questions of fact or law concerning Defendant's liability to all Class Members predominate over any questions affecting only individual Class Members. Plaintiffs' proposed class action is the superior method for resolving this dispute because it is impracticable to bring proposed Class Members' individual claims before the Court, especially where, as here, individual Class Members' damages are relatively small. Class treatment permits many similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class action mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may

arise in the management of this class action. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## FIRST CLAIM FOR RELIEF
**Deceptive Acts and Practices - N.Y. Gen. Bus. Law § 349, *et seq.***
**(Asserted on Behalf of Plaintiffs Maggi and Yeates and the New York Class)**

84. Plaintiffs repeat and re-allege the above allegations as if fully set forth herein.

85. N.Y. Gen. Bus. Law § 349(a) provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

86. Kind committed deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349 by affirmatively and knowingly misrepresenting on its product packaging, website, and marketing materials that its Dopamine Patches contain dopamine.

87. Kind's actions regarding the advertising and sale of its Dopamine Patches, as described herein, are deceptive acts or practices in the conduct of business trade or commerce of goods and in the furnishing of consumer products.

88. The deceptive acts or practices and the sale of goods took place in this State because Kind sells Dopamine Patches in this State, disseminated its false and deceptive advertisements in this State, and because the purchase transactions took place in this State when Ms. Maggi and Ms. Yeates made their purchases on the Kind website and paid Kind for the Dopamine Paches in this State. In short, the underlying nature of the deceptive transactions occurred in New York.

89. N.Y. Gen. Bus. Law § 349(h) provides that "any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount

not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willingly or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff."

90. Plaintiffs and the New York Class reasonably relied on Kind's materially misleading representations that the Dopamine Patches contained dopamine in deciding to purchase the patches.

91. Plaintiffs and the New York Class did not receive the benefit of the bargain because Kind's Dopamine Patches did not actually contain dopamine and therefore, did not provide any of the advertised health benefits as promised.

92. As an actual and proximate result of Kind's misconduct, Plaintiffs and the New York Class have been injured by Defendant's deceptive acts and practices and have suffered an ascertainable loss in that they paid more for the Dopamine Patches than they otherwise would have but for Kind's false and misleading advertising.

93. Thus, Defendant is liable to Plaintiffs and the New York Class Members for damages in amounts to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**False Advertising – N.Y. Gen. Bus. Law § 350, *et seq.***
**(Asserted on Behalf of Plaintiffs Maggi and Yeates and the New York Class)**

94. Plaintiffs repeat and re-allege the above allegations as if fully set forth herein.

95. N.Y. Gen. Bus. Law § 350 provides that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

96. Kind's false advertising of the Dopamine Patches occurred, and continues to occur, in the course of Kind's trade or business.

97. Kind's false advertising took place in this State because Kind sells Dopamine Patches in this State and disseminated its false and deceptive advertisements in this State.

98. N.Y. Gen. Bus. Law § 350-e provides that Plaintiffs and the New York Class may seek "actual damages or five hundred dollars, whichever is greater" and the "court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages, up to ten thousand dollars, if the court finds that the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff."

99. Plaintiffs and the New York Class reasonably relied on Kind's materially misleading representations that the Dopamine Patches contained dopamine in deciding to purchase the patches.

100. Plaintiffs and the New York Class did not receive the benefit of the bargain because Kind's Dopamine Patches did not actually contain dopamine and therefore, did not provide any of the advertised health benefits as promised.

101. As an actual and proximate result of Kind's misconduct, Plaintiffs and the New York Class have been injured by Defendant's deceptive acts and practices and have suffered an ascertainable loss in that they paid more for the Dopamine Patches than they otherwise would have but for Kind's false and misleading advertising.

102. Thus, Defendant is liable to Plaintiffs and the New York Class Members for damages in amounts to be proven at trial.

## THIRD CLAIM FOR RELIEF
**Unfair Competition Law ("UCL") – Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of Plaintiffs Wilbur and Ackerman and the California Class)**

103. Plaintiffs repeat and re-allege the above allegations as if fully set forth herein.

104. California's UCL prohibits, and provides civil remedies for, "unfair competition," including any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200, *et seq*. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

105. The UCL imposes strict liability. Plaintiffs need not prove that Kind intentionally or negligently engaged in an unfair business practice—but only that such practices occurred.

106. Plaintiffs have standing to pursue this claim because Plaintiffs have suffered injury-in-fact and have lost money or property as a result of Defendant's unlawful, unfair, and fraudulent actions. Specifically, Plaintiffs purchased the Dopamine Patches for their own personal uses. In doing so, Plaintiffs relied on the false representations that the patches contained "dopamine" when in fact, they contained none. Plaintiffs expended money in the transactions that they otherwise would not have had they known Defendant's advertising claims were false.

***"Unfair" Prong***

107. A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications, and motives against the gravity of the harm to the alleged victims.

108. Defendant's conduct constitutes an "unfair" business practice because, as alleged herein, Defendant engaged in a false advertising campaign that mislead consumers into believing that they were receiving a product that contained dopamine and the positive neurological benefits that are publicly associated with and widely recognized with dopamine medications. But in reality,

however, the herbal ingredients in Kind's Dopamine Patches are ineffective at providing the same benefits as the actual dopamine chemical or a dopamine agonist via transdermal delivery.

109. Defendant's acts and practices offend an established public policy of truthful advertising in the marketplace, and constitute immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

110. Such practice is devoid of utility and outweighed by the gravity of the harm to Plaintiffs and the California Class who lost money or property by paying for the Dopamine Patches. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the unfair conduct described herein.

***"Fraudulent" Prong***

111. A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the public.

112. Kind engaged in a fraudulent business practice by knowingly representing the patches as containing dopamine and would provide the positive neurological benefits associated with dopamine. Defendant's practice deceived Plaintiffs and are highly likely to deceive members of the consuming public who purchased the Dopamine Patches in reliance on its advertisements.

113. Plaintiffs and California Class Members acted reasonably when they relied on Kind's misrepresentations concerning the Dopamine Patches.

114. Had Plaintiffs and California Class Members known that Defendant's representations concerning its Dopamine Patches were false, they would not have purchased the Dopamine Patches or would have paid substantially less for them.

***"Unlawful" Prong***

115. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

116. Kind's actions, as alleged herein, constitute illegal and unlawful practices committed in violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* (the "CLRA") and the False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* (the "FAL").

117. As a direct and proximate result of Kind's unfair, fraudulent, and unlawful practices, Plaintiffs and California Class members have suffered damages.

118. Kind has been unjustly enriched and should be required to disgorge its unjust profits and make restitution to Plaintiffs and California Class Members pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

119. Additionally, Plaintiffs and California Class Members seek an order requiring Defendant to pay attorneys' fees pursuant to Cal. Civ. Code § 1021.5.

## FOURTH CLAIM FOR RELIEF

**False Advertising Law ("FAL") – Cal. Bus. & Prof. Code § 17500, *et seq.***
**(On Behalf of Plaintiffs Wilbur and Ackerman and the California Class)**

120. Plaintiffs repeat and re-allege the above allegations as if fully set forth herein.

121. Plaintiffs have standing to pursue this claim because Plaintiffs have suffered injury-in-fact and have lost money or property as a result of Defendant's unlawful, unfair, and fraudulent actions. Specifically, Plaintiffs purchased the Dopamine Patches for their own personal uses. In doing so, Plaintiffs relied on the false representations that the patches contained "dopamine" when in fact, they contained none. Plaintiffs expended money in the transactions that they otherwise would not have had they known Defendant's advertising claims were false.

122. California's False Advertising Law ("FAL"), California Business & Professions Code § 17500, states that "[i]t is unlawful for any . . . corporation . . . with intent . . . to dispose of . . . personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known to be untrue or misleading . . . ."

123. Defendant violated Business & Professions Code § 17500 by publicly disseminating false and misleading advertisements regarding the Dopamine Patches.

124. Defendant's false and misleading advertisements were disseminated to increase sales of the Dopamine Patches.

125. Defendant knew or should have known its representations and advertisements concerning the Dopamine Patches were false, deceptive, and misleading to reasonable consumers because the herbal ingredients are ineffective at providing the same benefits as the actual dopamine chemical or a dopamine agonist via transdermal delivery.

126. Plaintiffs and the members of the California Class have suffered harm as a result of these violations of the FAL because they have paid money for the Dopamine Patches that they otherwise would not have paid had they known they did not actually contain dopamine and would not work as advertised.

127. Pursuant to Bus. & Prof. Code §§ 17203 and 17500, Plaintiffs and the members of the California Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its deceptive practices.

128. Further, Plaintiffs request an order awarding Plaintiffs and other California Class Members restitution of the money wrongfully acquired by Defendant by means of said misrepresentations.

129. Additionally, Plaintiffs and California Class Members seek an order requiring Defendant to pay attorneys' fees pursuant to Cal. Civ. Code § 1021.5.

**FIFTH CLAIM FOR RELIEF**
**Consumers Legal Remedies Act ("CLRA") – Cal. Civ. Code § 1750, *et seq.***
**(On Behalf of Plaintiffs Wilbur and Ackerman and the California Class)**

130. Plaintiffs repeat and re-allege the above allegations as if fully set forth herein.

131. Plaintiffs have standing to pursue this claim because Plaintiffs have suffered injury-in-fact and have lost money or property as a result of Defendant's unlawful, unfair, and fraudulent actions. Specifically, Plaintiffs purchased the Dopamine Patches for their own personal uses. In doing so, Plaintiffs relied on the false representations that the patches contained "dopamine" when in fact, they contained none. Plaintiffs expended money in the transactions that they otherwise would not have had they known Defendant's advertising claims were false.

132. The Consumers Legal Remedies Act ("CLRA") was enacted to protect consumers against unfair and deceptive business practices. The CLRA applies to Defendant's acts and practices because the Act covers transactions involving the sale of goods to consumers.

133. Plaintiffs and the members of the California Class are "consumers" as defined by California Civil Code § 1761(d). Kind's Dopamine Patches are "goods" within the meaning of Cal. Civ. Code § 1761(a). Defendant's sale of the Dopamine Patches were "transactions" within the meaning of Cal. Civ. Code § 1761(e).

134. Kind violated the CLRA by engaging in the following proscribed practices by California Civil Code § 1770(a) in transactions with Plaintiffs and California Class Members which were intended to result in, and did result in, the sale of Dopamine Patches:

a. "Representing that goods. . . have . . . characteristics, ingredients, uses [or] benefits. . . that they do not have" (a)(5); and

b. "Advertising goods . . . with intent not to sell them as advertised" (a)(9).

135. Kind's misrepresentations alleged herein were material to and relied upon by Plaintiffs and reasonable consumers when deciding whether to purchase the Dopamine Patches.

136. If Plaintiffs and the California Class Members had known that the Dopamine Patches did not contain "dopamine" and could not provide the benefits as advertised, they would not have purchased the patches at all or would have paid substantially less for them.

137. As a direct and proximate result of Defendant's conduct, Plaintiffs and the California Class Members suffered injury and damages in an amount to be determined at trial.

138. Pursuant to § 1782(a) of the CLRA, Plaintiffs' Counsel notified Defendant in writing by certified mail of the particular violations of § 1770 of the CLRA and demanded that it rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to act. If Defendant fails to comply, Plaintiffs will seek all available remedies. For now, Plaintiffs seek only injunctive relief with respect to this claim.

**SIXTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Asserted on Behalf of Plaintiffs and the Nationwide Class)**

139. Plaintiffs repeat and re-allege the above allegations as if fully set forth herein.

140. To the detriment of Plaintiffs and the Classes, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

141. Plaintiffs and the Classes conferred a benefit on Defendant in the form of payment for the Dopamine Patches.

142. Defendant unfairly, deceptively, unjustly, and/or unlawfully seized and accepted said benefits which, under the circumstances, would be unjust to allow Defendant to retain.

143. Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

144. Plaintiffs and the Classes, therefore, seek disgorgement of all wrongfully obtained money received by Defendant as a result of its inequitable conduct as more fully stated herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Classes seek judgment in an amount to be determined at trial as follows:

a. Certifying the Classes as requested herein, appointing Plaintiffs as Class Representatives, and appointing their counsel as Class Counsel;

b. Declaring Defendant's misconduct alleged herein to be unlawful;

c. Awarding monetary damages, statutory damages, and exemplary and/or punitive damages, as appropriate, according to proof;

d. Ordering Defendant to disgorge and make restitution of all monies Defendant acquired by means of the unlawful practices set forth above;

e. Awarding Plaintiffs and the Classes reasonable attorneys' fees and costs of suit;

f. Awarding pre-judgment and post-judgment interest; and

g. Granting any other relief as this Court may deem just, proper, and equitable.

**JURY DEMAND**

Plaintiffs hereby demand a jury trial on all claims so triable.

Dated: July 29, 2026

**KALIELGOLD PLLC**

By: */s/ Sophia G. Gold*

Sophia G. Gold (Bar Roll No. 701241)
*sgold@kalielgold.com*
490 43rd Street, No. 122
Oakland, California 94609
Tel: (202) 350-4783

Jeffrey D. Kaliel (Bar Roll No. 518372)
*jkaliel@kalielpllc.com*
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Tel: (202) 350-4783

*Attorneys for Plaintiffs and the Putative Classes*